At the outset, I do want to assure you that we are prepared for your cases this morning. We have read your briefs. Because we are prepared, we would prefer it if you'd please spend your time arguing the most critical issues in the case. We will assume that for issues that are not argued today, that you rely upon the arguments contained in your briefs. Finally, if you're an attorney for the appellant and wish to reserve some time for rebuttal, please indicate to me and also to our court officer. With that, you may call the first case. Case number 18-3653, US HF Cellular Communications et al. v. Scottsdale Insurance Company. Oral argument not to exceed 15 minutes per side. Mr. Powers for the appellant. Good morning, Mr. Powers. Good morning, Your Honor. There's a pending motion to use exhibits at oral argument. It's my understanding that there's a stipulation to grant the motion. Is that correct? All right. Motion is granted. May it please the court, Your Honor, I'll go 10 minutes reserving five. Reserve five? Yes, Your Honor. Very good. Your Honor, I will begin first with what I call the late notice issue.  I'll call this case to some very simple documents, easy to follow. Tab one, I think the best way to start with an insurance policy and how to read an insurance policy is at the beginning of the policy. Tab one is the declaration page. The declaration page, first page of the policy contains the- We don't have tabs. I assume you mean exhibit one in our packet? Yes. In tab one, if you look at the declaration page, right there at the bottom of the page is continuity date, July 31, 2013. Continuity date, continuous continuity. Next page under tab one will direct your eyes to the exclusions that tie to the continuity date. The exclusion, if you look at exclusion K, excludes claims alleging based upon arising out of attributable to, directly or indirectly resulting from, et cetera, any prior or pending litigation or administrative or regulatory procedure, demand letter, et cetera, filed or pending on or before the continuity date. Not on or before the inception of the policy, on or before the continuity date, thus creating a clear conflict between a claims made and reported policy and what this is under HILPRIN, a continuous coverage. But you still had to report it during the policy time period, right? Well, Your Honor, I think you had to report it certainly during the policy period of the third policy. The deck page I just gave you is the deck page for the third policy. Where does it say that what you're citing to us overrides the requirement that if this event occurred in the first year of this three-year continuity period, that you could wait until, what would it be, 38 months after an event that occurred on the first day of the first policy period? Your Honor, by event, I assume you're saying the lawsuit being filed. This is a prior acts policy. Yes, right. So the acts could actually occur. The act that's covered. The claim that's made. What I'm saying is that you have a conflict in the terms of the policy. You have a claim, it's a claims made and reported. Why is there a conflict? I mean, one says what it covers, the other says when you have to report what's covered. Why is that a conflict? Well, Your Honor, it says you have to report during the policy period, which we did during the policy period of the third policy, and the continuity date says that it covers any lawsuits basically that are filed after the continuity date. Does the deck page say that the policy period is this three-year continuity period, or does it say that it is a one-year discreet 12-month period? Well, to the literally minded, what it says is... It's kind of what we do. We're kind of literally... To the literally minded, it says that this policy period, that the claim must arise during the policy period, during the policy period. It doesn't say the policy period of this policy. It says the policy period. Also, if you look at... This is coming down to us, whether they do or don't have redundant language that says policy period during the policy period? Well, it's not only redundant, but if you look at, again, the deck page... I'm saying you're being redundant now, what this says. No, Your Honor, I don't believe so, because if you look at the renewal, the deck page, there's a reference to the renewal policy. What would be the point in any insurance policy saying that you didn't have to report something that was covered during the policy period, but if the policy was renewed, you could report it... Let's assume that this policy was in effect for 20 years. So you could wait 20 years before you reported something, and then under your construction, it would be covered. Well, Your Honor, I mean, think of it this way. Is that right? Yes. Think of it this way. Do you have any authority for that? Your Honor... Has any case ever come close to saying what you're saying? Well, Your Honor, the case that we rely upon, of course, is the Halperin case out of Ohio, which says if you have continuous coverage, then you can report it so long as that continuous coverage is in place. Now, obviously, there's a reasonableness here. Does that case have different language than the policies we've got here? I don't think it's a difference in kind. Kind? I mean, there is a difference in language. There is, Your Honor, but they both deal with exclusion, and they both deal with the concept of continuity, of continuous coverage. Okay, they both deal with a general subject matter, but that doesn't seem like a lot of precedent. Well, if you read the exclusion I just read to Your Honor, that exclusion is dealing... It clearly says... It could have been written, look, this policy doesn't cover litigation that was filed before the commencement of the policy period of this policy. It doesn't do that. It specifically says this policy covers litigation... This policy doesn't cover litigation filed before the continuity date, which is two years earlier. It's not too much to ask of an insurance company to be clear in their exclusion, but it's so easy to have written that. Well, Helberg was clear. They said, and continuously renewed thereafter in the notice provision. That language is conspicuously absent from this policy. But the renewal policy is conspicuously shown on the front page of the DEC page. It's specifically what? I'm sorry. It says renewal number 135588. The renewal policy is mentioned on the DEC page. Why would we even mention the renewal policy unless it had some reference or some significance to the policy that is coming into being? I don't know if we can speculate, but we usually interpret the terms of the insurance contract pursuant to its terms. So we don't imagine what they might mean. We look at and see what they actually do mean, don't we? Well, Your Honor, on that test, if we're not going to imagine or assume things... We don't, do we? We don't. So let's see how much imagining and assumption there is with respect to the material misrepresentation claim. Okay? Let me deal with the global policy for just a second. With respect to the global policy, that large, that noise you hear is the total absence of any testimony by an underwriter that says anything was material with respect to the application. Doesn't the contract say that, though? Well, Your Honor... For misrepresentations, it's deemed to be material under the language of the policy. I think the law of materiality is that materiality is a combination of law and fact. I mean, fact and law. And it's a fact issue. And as Judge Griffin... You can't agree in advance in the policy that something is material? Well, it can't be both material and immaterial at the same time. And part of the record here is... Wait a minute. Why can't something that would otherwise be immaterial, absent an agreement, become material when you agree in advance what's material and what's not material? Well, Your Honor, if that's... All of the applications... Is that one of these literal readings again? No, but Judge, I think the case authority we've cited says quite clearly that materiality is an issue of fact and law. You can't say... Can't make a chair a desk by calling it a desk. It's still a chair in your contract. And besides that, you would have... Let's assume for a second that there's something that... There's a legitimate dispute about whether something is material or not material. And we'll use reporting as... We'll use the existence of a lawsuit as one of those issues. Why can't you resolve that uncertainty by virtue of putting in the policy a definition of what's material and what's not, which in this case basically says any representation is material? The policy also... Why can't you do that? Well, they did do that. But the policy also... Why isn't that effective? Because then you have a clear conflict with the earlier applications. Remember that in this policy, all the earlier applications are pulled into the policy. All prior applications. The... This is a fact that seems to be lost in the briefing. Global was insured as an additional insured under the cellular policy based on an application that made no inquiry whatsoever into any litigation against global or cellular. Now, how can litigation against cellular be relevant to a standalone policy for global when it wasn't relevant to global being an additional insured on a cellular policy for the same amount of money, for $5 million? You make that argument in your briefing. I absolutely did. And in the book, in the notebook we've given to you, take a look at the application that was made for... But before we go to tab two, the last page of the cellular policy, the third year cellular policy, what does it show? It shows that global and Terlingua are listed as additional insureds on the cellular policy. Tab two is the application for the cellular policy, third term. That application asks not a single question about prior litigation. Doesn't ask a single question about any circumstances that might give rise to a claim. Now, that application was the application that was submitted for cellular on the cellular policy that listed global as an additional insured. Let me walk this down the road for you. Let me walk it down the road. Why did you try to get additional insurance for global then if they were already covered? Because global was a... If you read the shareholder agreement, the idea was that the affiliates would form another company and that that company would be engaged in communications business. So global was going to go into business different than the waiver business, and they needed coverage with respect to matters that were not related to the waiver business. Shipcom was just the waiver business, just the waiver business. Global was everything other than the waiver business. So they wanted a standalone policy. Let me... How much time do I have? Why did your client wait eight months to notify the insurance company of the lawsuit? Your Honor, that's not on the record, but it's not. May I answer this? Sure, sure. But it's sort of easy to understand. You've got lawyers at Mobile, Alabama handling the litigation. For you? For your clients? For my clients. Is there a legal malpractice action pending against those lawyers that did not notify the insurance company of the lawsuit? If there's not, there probably should be. Well, Your Honor, I hear you on that. But with respect to... I cannot disclose that, Your Honor. Sure, okay. I mean, I often have people say, I have no remedy unless you rule in our favor. I said, no, I think you probably have a remedy against a lawyer somewhere for not notifying the insurance company of a lawsuit. And somehow this lawsuit was defended by somebody because there wasn't a default entered. And it's just hard for me to understand, that's all. Your Honor, I know my time's up, but may I please walk this down the road for just one moment? I'll give you 30 seconds to wrap it up. Your Honor, if that other writer... You can use your rebuttal time right now, by the way. I'll use it right now. Okay. Your Honor... Five minutes? Five minutes. Let's walk this down the road. Sure. As they say in Texas, no matter how flat the tortilla, it still has two sides. Now, let's say, just a moment, let's assume for just a moment that the underwriter picks up the phone. Of course, there's still evidence from the underwriter at all. Underwriter picks up the phone. Says, Mr. Bayek, I have an application here for this standalone policy for global. And it says, yes, that you've been sued. What's this about? And he said, Mr. Bayek says, well, I've been sued and Seller has been sued. I thought you knew about that. Did my defense lawyers tell you about it? No, they didn't tell us about it. Well, Mr. Bayek, we can't issue global standalone policy. Mr. Bayek says, oh, that's okay. We're insured under the cellular policy already. We'll just keep that policy in place. And you know what? We'll take global's application for its own policy, for a standalone policy, to your competitor, get a policy issued from your competitor, and they'll endorse out the automobile litigation. That's the conversation that should have happened. The point is, how could it possibly be material? They were already insured under the cellular policy. They already had coverage, global, already had coverage for the litigation of mobile. And there's no question that there was timely reporting, as to mobile, as to global. So how in the world does, what the disconnect is this. If they had said, we're not going to issue global a standalone policy, fine. We're already insured with respect to the mobile litigation under the cellular policy. We could have gone to another carrier. Well, they didn't deny coverage to global on the other policies based on timeliness, did they? No, what they did, which is. Because it was timely. What they did, which is interesting, is that somehow, when they issued the standalone policy, they endorsed off, now I don't know how, where they got the consideration to do this, but they endorsed off global as an insured under the cellular policy. Well, wait a minute, you just said that they were covered under the, as an add-on insured under the other policies. Now you're telling me there's another document, global policy, that eliminated that. What happened was, is when the policy, when the standalone policy was issued to global, the insurance company on its own added an endorsement to the cellular policy that took off global as an insured under the cellular policy. I assume the reasoning was that there's a. Have you contested that on what you just alluded to as a lack of consideration? Well, what was the lack of. What I'm getting to is, is you seem to say none of this makes any difference because they were an additional insured under the other policy. But now you're explaining, at least the insurance company claims they weren't. And have you litigated whether you are entitled to coverage under the, as an additional insured, under the, what do you call it, HF policies? Well, your honor, have we litigated that? Interesting question, I have to think about that. The bottom line is, is that the, that in terms of materiality, we were already insured. How could it be material under one policy and not the other policy? Because you just told us that they've endorsed you out under the other policy. Because they issued the second policy. They issued the global policy. If this were, again, if this was material to the issuance of the second policy, fine. Don't issue the second policy. What does that mean? The first policy, the cellular policy is in place. Global's insured as an additional insured under that policy. It can only be material to the issuance of that global standalone policy. It can't be material to a policy you've already issued. So, if you're, if the result is you're not going to insure a global under its own policy, fine. They're insured under the prior policy. You don't get to endorse them off coverage. And, I mean, that's what, that's what is so frustrating here. Judge Griffin, you, you were in a, you had a case not that long ago, dealing with a material misrepresentation. 2017, I have the site here someplace, let's see if I can find it real quick. And in that case, you spent a lot of time talking about how there was testimony from the underwriter. Testimony by the underwriter saying why the misrepresentation, the issue in that case was whether it was innocent or not innocent. And then you decided, it didn't matter whether it was innocent or not, it was still material. But you had testimony from the underwriter, where the underwriter explained to the court, look, this is a material issue because it would affect how I price the premium. I, you know, I wouldn't have done it without knowing this. And you relied upon the testimony of the underwriter. There is not a scintilla of evidence from the underwriter that they relied on anything whatsoever. Nothing. That testimony is not there. And the reason, how easy it would have been. How easy it would have been to have an underwriter's affidavit say I relied on this. The reason there isn't an underwriter's affidavit is the obvious. It didn't make a difference. Because if the underwriter, if there had been any dialogue. Are you talking about Global, though? This is the one that's in the contract. They didn't have any evidence in there because you had already agreed that it was going to be material. Well, Your Honor, again, we also have in the evidence the fact that it was already insured based on an application that made no inquiry. It wasn't, if it wasn't material, how could it become material? You can't be both material and immaterial at the same time. I'm confused. I think in the same way maybe Judge Albandian is. My recollection was this wasn't litigated at the time of the trial. They didn't bring an underwriter in to testify because you hadn't raised the issue of whether it was material. Am I recalling that incorrectly? No, we definitely raised the issue of materiality throughout the underlying, there wasn't a trial. This was a summary, Judge. There's not a robust record here. But it would have been so simple to have supplied an affidavit. Again, back to his question, what would have triggered their obligation to produce an affidavit in light of the language and the policy? The fact that you had already existing a policy that insured global without so much as a question of whether or not there was prior pending litigation against global or cellular. I mean, there's inconsistency. If we go back to the record, you say we'll find an argument that says that the materiality clause language doesn't apply here because of this fact that they were an additional insured under another policy. Yes, Your Honor, we made a very big point of the fact that the- Yes, that's fine. Yes. Here's what you'll- You say it's there, I'll look. You'll find, and what you'll see in there is you'll see that we made a big, big deal out of the fact that the application- Got it, I got it. I understand. All right, Mr. Powers, you're out of time. Any further questions? Thank you, Your Honor. Thank you. Good morning. Good morning, Your Honors. Darius Candewalla along with Sabrina Horan for Scottsdale Insurance Company. Your Honor, starting with the global application issue, the materiality issue was raised generically before the trial court. The trial court properly found that the policy and the endorsement to the policy specifically builds into an agreement by the insurers to agree that when they make representations in their applications, those representations are material. What was not raised before the trial court, amongst a number of issues not raised before the trial court, was this issue that global was annexed on to the US HFCC policy. And by virtue of that, that somehow signifies Scottsdale not caring whether global was an insured risk. Throughout the course of the underlying litigation, appellants argued that this was not one potential $5 million exposure, but yet that this underlying claim triggered multiple exposures under multiple years of the US HFCC policy, the US HFCC policy, and separately under the global policy. Only now do they argue that there's a tie-in limit so Mr. Bayek wouldn't have been motivated to lie in an application when he applied for a new coverage. Well, what the record evidence is, in addition to the plain language of the policy that builds materiality into the policy, it shows that Scottsdale asked for not just this application from Mr. Bayek when the global policy was being issued, but it asked for separate warranty statements from US HFCC. It asked for a warranty statement with respect to US HFCC and separate warranty statement as to global. It went beyond that and asked for this application. Now, your honors, the question in the application was whether any applicant or anybody proposed for insurance was previously named in any legal proceeding, demand letter, involved in any legal proceeding or demand letter in their capacity as a director, officer, or employee. How could that not be material to an underwriter? What would be more material to an underwriter as to whether or not somebody proposed for insurance had been named in a prior lawsuit in their capacity as a corporate director, officer, or an employee of the company? Mr. Bayek, he originally, and this is another issue that appellants raised for the first time on appeal, that they try and attribute Mr. Bayek's change of his question in an application from a yes in an original global application to a no as his realization that, well, he realized that he hadn't been named in that capacity, so he must have changed it on that basis. But what the record shows is that the revised application was submitted by the insurance agent, and it was accompanied with an explanation that because of Mr. Richmond, the COO of the company's warranty statement, saying that he wasn't aware of any fact, circumstance, or situation that could give rise to a claim, Mr. Bayek was changing the answer in his application to comport with that. And therefore, he was submitting a new application that said no. No insured was named in any, or no potential insured was named in any past litigation. This was despite the fact that this ongoing, underlying litigation had been pending, despite the fact that global had already been implicated in that litigation as the successor in interest to which all the assets were being transferred, the same type of— Global hadn't been sued yet, right? That's correct. What about their argument that the misrepresentation has to be related to the claim that you're denying? It does. This is an exclusion. It's not a rescission case. And so the claim, in order to be excluded, has to arise out of, be based upon, involve the misrepresentation. Well, here, the risk was, the misrepresented thing was that lawsuit. There's no question that lawsuit was pending. The very thing that they're asking us to insure is the thing that they didn't disclose. So there's no possible way they can get around the— Global was just added in an amended complaint to the same lawsuit. That's right, right. The same effectively derivative lawsuit. They were named as effectively a successor in a successor liability capacity that USFCC was taking assets out of SHIPCOM, the entity in which the underlying plaintiffs had invested in their minority shareholders. They felt like they were getting squeezed out. And through different ruminations, the USFCC people, officers, were shifting those assets out of the company, the most valuable assets out of the company SHIPCOM. The transfer of those assets, eventual transfer of those assets to Global was just one more step in the continuum of that wrongdoing. And that had already been previewed in the complaint that had been filed prior to the date that BIOC signed that application. It had already been previewed prior to the date that John Richmond submitted warranty statements saying that he wasn't aware of any fact, circumstance, or situation that could give rise to a claim. So what about the argument that I think we were hearing earlier about how, never mind, they were an additional insured under the earlier policy? Well, one, Your Honor, if they were added, they were added at one point. This was July 31st, 2015. So this was the latest policy after the lawsuit had already been filed. So they were added. Within a month of that, we have this underwriting history. We've got the warranty statements coming in. We've got the application from BIOC. Because this issue wasn't raised below, I don't know, and there's no evidence as to the actual progression of underwriting, whether they were added, and whether that was subject to those warranty statements and application. That is, if you look at the underwriting history as a whole, throughout each renewal, and the appellants make light of this, at each renewal of the policy, as you would have a renewed insured, you wouldn't ask the question, are you the subject of any litigation, because presumably an insured would notice a lawsuit when a lawsuit's filed against them. That's why you have insurance. At this time, for no other reason other than what appears to be that Global was added as an insured, Scottsdale requests the warranty statements. So within a month of Global being added as an entity pursuant to that endorsement to the policy, Scottsdale receives these warranty statements from Mr. Richmond. Our sense is that Scottsdale requested those in connection with adding it on to the policy, and made that adding it on to the policy subject to receipt of those warranty statements. This is common practice, what underwriters do. The new Global policy, when it was issued, it was subject to these conditions that it get an acceptable warranty statement. So that could be the context of that. Number two, that would not have had a material effect on Scottsdale's risk. So for instance, if the lawsuit had been filed against USHCC in policy year two, and Global was added in policy year three, if this all still does relate back to a claim made prior to that date, and if that policy has the same prior pending litigation exclusion and everything else, it doesn't change the risk profile. It's still the same $5 million limit of liability. But that's unlike when Global goes and gets a new policy, and gets a new fresh $5 million limit of liability solely for itself and solely for its directors and officers. And there's a tie-in limit endorsement. Again, appellants raise this for the first time on appeal, that there's a tie-in limits endorsement that ties in the limits between policies. But this tie-in limits endorsement is only applicable with respect to the same claim, and it's only applicable to the policy that's of the same policy year as that Global policy. So the last policy year. So you're saying then that if they had wanted to stack the coverage here and get $5 million on the one policy and $5 million on the other, Scottsdale wasn't willing to do that. So they excluded the additional insured from the first policy, wrote the new $5 million policy. So what was the point then of the new $5 million standalone Global policy? Well, at some point, the insured Global apparently wanted its own limit. It wanted its own policy for whatever reason. It's its own entity. It didn't want the association with USFCC. And Scottsdale was willing to issue that policy separately to Global and insure it for a separate $5 million claims-bidden reported $5 million policy. What it wasn't willing to do was insure it for $5 million under that policy, and then also under the USHC. So all the insureds on the first policy shared the $5 million limits. That's correct. This way, they got their own $5 million, but you weren't willing to let them keep their $5 million as an additional insured under the other. Okay, I understand. Thank you. So if Global was covered under the first, under the other policies, and they were named in a first, in an amended complaint, would there be a separate reporting requirement that would be later because they were a party that was added later? In other words, if they get sued in the second amended complaint, then is that when the reporting requirement is triggered solely for them as an insured under that policy? From a claims-made perspective, yes. Because the claim for Global itself as an entity, the reporting requirement would be keyed back to when the claim was first made against Global as an entity. If another insured, like here, Mr. Bayek, who's also a Global CEO, was named in a prior lawsuit, then there's potential for that claim having been made prior to that point. And there's other overlapping issues like the prior pending litigation exclusion, which we raised before the district court, which is really an easy A to B kind of analysis of there was at the time, so basically when this Global policy was issued, there was this, as Mr. Warner alluded to, there's a continuity date on the policies when the policies are first issued, and then there's exclusions keyed to that continuity date. So prior pending litigation exclusion effectively provides that if there's ongoing litigation or if there's a lawsuit filed prior to that policy inception, if the claim is made during the policy and it ties back into the claim made prior to the policy period, or if the lawsuit, in this case, like a different earlier iteration of the complaint, was filed during an earlier period and then Global gets added to that very same lawsuit, there wouldn't be coverage for it for that reason. But that's different than a reporting requirement. The reporting requirement would be keyed to when the claim is actually made. Your Honor, just touching upon a couple of other issues that were raised in appellant's reply brief that we didn't have a chance to respond to, and obviously issues that were raised for the first time on appeal to the extent the court considers them at all. Appellants make light of the fact there was a revised Global application that was not signed by Mr. Biok. This is simply not true. The revised Global application was signed by Mr. Biok. Record Evidence 35 is a stipulation that the appellants entered into in the trial court in which they stipulated that Mr. Biok signed the revised application on August 31st, 2015. Can I ask you about the choice of law issue? Sure. The district court thought it was a close question. I'm curious, did you have the burden of proof on that or did a party have the burden to show that it was one or the other? Is there a presumption that we should apply Ohio unless the restatement says otherwise? I think most courts have approached it as a more objective test than a burden-based test, but I've seen reference to the party that's asserting an application of a law that's different than the forum states law as the one who should carry the burden with respect to showing at least that there's a conflict, so that there's a conflict in the laws to justify. Have the courts in Ohio said anything about that? I believe I've seen that in an Ohio decision on conflicts of law. But again, it doesn't appear to be a driving factor when it comes down to it both at the trial court level and court of appeals level. It appears that courts are weighing the restatement second conflicts law factors and determining what is the most significant relationship to the contract and to the parties and determining amongst those factors which are more important than others. But mechanically, if we're supposed to presume that Ohio law applies and then somebody has to take you out of that box and it's a close question, doesn't that affect the analysis? But I don't know if the burden of proof is a presumption that Ohio law applies as a presumption that there's no conflict to start with. So the default is certainly that the state law, so maybe that's the same as presumption, but that the state law of the forum state's going to apply. For some unknown reason. That's always the default position. The default, right, right. Does the choice of law make a difference here? I know Ohio's more favorable to the plaintiff. But is it dispositive that plaintiff would win on Ohio as opposed to California law? We'd submit it's not dispositive. There are a couple decisions in Ohio that, as your honors pointed out on appellant's argument, have found under particular language, continuously renewed language, that with respect to the notice issue, when a policy contains continuously renewed language, that policies are deemed to be, reporting periods are to be extended throughout the course of however long policies are renewed. There's other decisions which we cite in our briefs, the Wendy's decision, the Asp decision, where courts have found the exact opposite in Ohio. The only difference is in California, courts have more uniformly said that when policies are renewed, that does not create a continuous reporting period. And the reporting period is going to be strictly enforced. But yes, your honor, we'd submit that the conclusion would be the same, irrespective of which state laws apply. Thank you, your honors. All right, any further questions? Thank you, counsel. I think you used your rebuttal, so case will be submitted. Thank you, counsel. May call the next case.